ORIGINAL

APPROVED: _Ehanft_____
     ELIZABETH A. HANFT
     Assistant United States Attorney

BEFORE:   THE HONORABLE JAMES L. COTT
      United States Magistrate Judge
      Southern District of New York

9MAG 26 96

- - - - - - - - - - - - - - - - x
                :
UNITED STATES OF AMERICA     :    **SEALED COMPLAINT**
                :
    - v. -          :
                :    Violations of
DANNY BANG,          :    21 U.S.C. §§ 812,
    a/k/a "Chi Anh Bang,"     :    841(a)(1), 841(b)(1)(A)
    a/k/a "Danny Anh Bang," and :    & 846
                :
CUONG BANG,          :
    a/k/a "Cuong Anh Bang,"    :
    a/k/a "John Bang,"      :
    a/k/a "Jay Bang,"       :
                :
      Defendants.    :
                :
- - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

    DOUGLAS M. WATERS, being duly sworn, deposes and says
that he is a Special Agent of the Drug Enforcement
Administration ("DEA"), and charges as follows:

## COUNT ONE
### (Narcotics Conspiracy)

    1.   From at least in or about February 2019, up to
and including at least on or about March 18, 2019, in the
Southern District of New York and elsewhere, DANNY BANG, a/k/a
"Chi Anh Bang," a/k/a "Danny Anh Bang," and CUONG BANG, a/k/a
"Cuong Anh Bang," a/k/a "John Bang," a/k/a "Jay Bang," the
defendants, and others known and unknown, intentionally and
knowingly did combine, conspire, confederate, and agree together
and with each other to violate the narcotics laws of the United
States.

2.    It was a part and an object of the conspiracy
that DANNY BANG, a/k/a "Chi Anh Bang," a/k/a "Danny Anh Bang,"
and CUONG BANG, a/k/a "Cuong Anh Bang," a/k/a "John Bang," a/k/a
"Jay Bang," the defendants, and others known and unknown, would
and did distribute and possess with intent to distribute a
controlled substance, in violation of Title 21, United States
Code, Section 841(a)(1).

3.    The controlled substance involved in the offense
was 500 grams and more of a mixture and substance containing a
detectable amount of methamphetamine, its salts, isomers, and
salts of its isomers, in violation of Title 21, United States
Code, Section 841(b)(1)(A).

(Title 21, United States Code, Section 846.)

The bases for my knowledge and the foregoing charges are as
follows:

4.    I have been a DEA Special Agent for approximately
18 years.  During my time as a DEA Special Agent, I have become
familiar with some of the ways in which narcotics traffickers
operate, and have participated in numerous investigations
involving international drug trafficking.  I have been
personally involved in the investigation of this matter.  This
affidavit is based on my communications with other law
enforcement officers and other individuals, and on my review of
various reports and records.  Because this affidavit is being
submitted for the limited purpose of establishing probable cause
for the offenses cited above, it does not include all of the
facts that I have learned during the course of the
investigation.  Where the contents of communications with others
and statements by others are reported herein, they are reported
in substance and in part, except where otherwise indicated.

### Overview

5.    In recent months, I have participated in a drug-
trafficking investigation of DANNY BANG, a/k/a "Chi Anh Bang,"
a/k/a "Danny Anh Bang," and CUONG BANG, a/k/a "Cuong Anh Bang,"
a/k/a "John Bang," a/k/a "Jay Bang," the defendants.  Based on
my conversations with other law enforcement agents and with two

DEA confidential sources ("CS-1"[1] and "CS-2"[2]), and my participation in the investigation, as described below, I have learned, in substance and in part, that on or about February 19, 2019, CS-1 and CS-2 met with DANNY BANG and CUONG BANG at a restaurant in Manhattan Beach, California ("Restaurant-1") and a nearby hotel bar. *See infra* ¶¶ 6-8. At that meeting (the "February 19 Meeting"), DANNY BANG discussed a plan to sell approximately ten kilograms of methamphetamine to CS-1, with the understanding that CS-1 would distribute at least three kilograms of that methamphetamine in New York on behalf of DANNY BANG and CUONG BANG. *See infra* ¶ 8. Based on my conversations with other law enforcement agents and with CS-1 and CS-2, I have further learned that, on or about February 20, 2019, CUONG BANG delivered to CS-1 and CS-2 a backpack containing ten plastic bags that each held a crystal-like substance, which later field-tested positive for the presence of methamphetamine (the "February 20 Transaction"). *See infra* ¶ 10. Subsequently, on or about March 18, 2019, an undercover officer provided CUONG BANG with approximately $36,000 in cash at a location in Manhattan, New York, as payment for the methamphetamine (the "March 18 Payment"). *See infra* ¶ 11.

### The February 19 Meeting

6.    Based on law enforcement agents' conversations with CS-1, I have learned, in substance and in part, that, on or about February 19, 2019, CS-1, who was acting at the DEA's direction, and an individual whom CS-1 believed, based on previous text message communications and in-person meetings, to be DANNY BANG, a/k/a "Chi Anh Bang," a/k/a "Danny Anh Bang," the defendant, agreed to meet at Restaurant-1 at approximately 6:30 p.m. According to CS-1, DANNY BANG informed CS-1 via text message that CUONG BANG, a/k/a "Cuong Anh Bang," a/k/a "John Bang," a/k/a "Jay Bang," the defendant, would be accompanying DANNY BANG to the February 19 Meeting.

---

[1] CS-1 has previously been convicted of a narcotics offense and is cooperating with the DEA in exchange for payment. Information provided by CS-1 has proven reliable and has been corroborated in part by independent evidence in this and other cases.

[2] CS-2 is cooperating with the DEA in exchange for payment. Information provided by CS-2 has proven reliable and has been corroborated in part by independent evidence in this and other cases.

7. Based on DEA agents' participation in surveillance of the February 19 Meeting, I have learned the following, in substance and in part:

a. On or about February 19, 2019, at approximately 6:40 p.m., a law enforcement agent observed CS-1 and CS-2 enter Restaurant-1.

b. During that time, agents observed a vehicle ("Vehicle-1") parked in Restaurant-1's parking lot that they learned, based on a vehicle records check, was registered to "Chi Bang."

c. At approximately 7:30 p.m., law enforcement agents entered Restaurant-1 and observed CS-1, CS-2, and two men whom law enforcement agents have identified, based on their comparison of those men's appearance with photographs in law enforcement databases, as DANNY BANG and CUONG BANG, seated at a table.

d. At approximately 8:20 p.m., law enforcement agents observed CS-1, CS-2, DANNY BANG, and CUONG BANG exit Restaurant-1.

e. DANNY BANG and CUONG BANG then entered Vehicle-1.

f. Law enforcement agents followed Vehicle-1 to a hotel in Manhattan Beach, California (the "Hotel").

g. CS-1 and CS-2 subsequently met with DANNY BANG and CUONG BANG at the bar of the Hotel.

h. At approximately 9:08 p.m., DANNY BANG and CUONG BANG exited the Hotel, entered Vehicle-1, and drove away.

8. Based on law enforcement agents' conversations with CS-1 and CS-2, I have learned the following, in substance and in part:

a. During the February 19 Meeting, which occurred in English and was recorded by CS-1 at the DEA's direction, DANNY BANG, a/k/a "Chi Anh Bang," a/k/a "Danny Anh Bang," the defendant, agreed that DANNY BANG would sell methamphetamine to CS-1 the following day (the "February 20 Transaction"). DANNY BANG and CS-1 further agreed, in

substance, that: CS-1 would pay DANNY BANG between approximately $3,600 and $3,800 per kilogram of methamphetamine for six of those kilograms; CS-1 would receive another three kilograms from DANNY BANG that CS-1 would sell in New York for approximately $12,000 per kilogram, and would then pay DANNY BANG $10,000 for each of those kilograms; and CS-1 would receive an additional kilogram for which he would pay DANNY BANG at a later date.

b.      DANNY BANG stated, in substance, that another individual ("CC-1") would transport the methamphetamine to the Los Angeles area from Mexico, and that an individual would deliver the methamphetamine to CS-1 at approximately 1:00 p.m. on February 20, 2019.

c.      DANNY BANG told CS-1, in substance, to provide payment for the methamphetamine to the person who delivered the methamphetamine to CS-1.

d.      DANNY BANG informed CS-1 and CS-2, in substance, that members of DANNY BANG's drug trafficking organization had recently traveled to Mexico in order to purchase kilograms of cocaine, and that DANNY BANG was leaving for Mexico soon in order to meet with his drug-trafficking associates.  DANNY BANG told CS-1 and CS-2 that DANNY BANG would coordinate the February 20 Transaction but did not have to be present for the sale, because he trusted CS-1.

### The February 20 Transaction

9.      Based on law enforcement agents' conversations with CS-1, I have learned, in substance and in part, that on or about February 20, 2019, DANNY BANG, a/k/a "Chi Anh Bang," a/k/a "Danny Anh Bang," the defendant, informed CS-1 via text message that a courier (the "Courier") would call CS-1 and arrange to meet CS-1 at a particular location in order to deliver a cellular phone, which would be used to coordinate the February 20 Transaction.  CS-1 told DANNY BANG that he would meet the Courier at a particular store's parking lot (the "Parking Lot") in North Hollywood, California in order for the Courier to drop off the cellular phone.  DANNY BANG further informed CS-1, via text message, that the price would in fact be $3,800 per kilogram of methamphetamine for the six kilograms that DANNY BANG had previously informed CS-1 he would sell at $3,500 per kilogram.

10.     Based on DEA agents' participation in

surveillance of the February 20 Transaction, I have learned the following, in substance and in part:

          a.    On or about February 20, 2019, at approximately 12:30 p.m., an undercover officer ("UC-1") drove CS-1 and CS-2 into the Parking Lot in a particular vehicle (the "UC Vehicle").

          b.    At approximately 1:02 p.m., CS-1 received a call from the Courier, who was subsequently identified as CUONG BANG, a/k/a "Cuong Anh Bang," a/k/a "John Bang," a/k/a "Jay Bang," the defendant, who stated that he was getting off the highway.

          c.    At approximately 1:13 p.m., CUONG BANG informed CS-1 that CUONG BANG was driving a black vehicle.

          d.    At approximately 1:16 p.m., CUONG BANG called CS-1 and instructed CS-1 to meet CUONG BANG at a restaurant ("Restaurant-2") located down the street from the Parking Lot.

          e.    Shortly thereafter, law enforcement agents observed CUONG BANG outside Restaurant-2, holding a bag labeled with the company name "T-Mobile/Metro PCS."

          f.    At approximately 1:19 p.m., law enforcement agents observed the UC Vehicle drive to the area of Restaurant-2. UC-1, CS-1, and CS-2 subsequently exited the UC Vehicle and approached CUONG BANG. UC-1, CS-1, CS-2, and CUONG BANG appeared to speak for several minutes. Based on law enforcement agents' conversations with CS-1 and CS-2, I have learned, in substance and in part, that, during this encounter, CUONG BANG provided CS-1 and CS-2 with a cellular phone, and that CS-2 and CUONG BANG subsequently communicated using that cellular phone.

          g.    At approximately 1:26 p.m., CUONG BANG entered a black vehicle ("Vehicle-2") and left the area.

          h.    At approximately 4:00 p.m., UC-1, CS-1, and CS-2 returned to the Parking Lot in the UC Vehicle.

          i.    At approximately 4:05 p.m., Vehicle-2 arrived, parked near the UC Vehicle, and drove away from the Parking Lot along with the UC Vehicle.

j.    At approximately 4:14 p.m., Vehicle-2 and the UC Vehicle drove into a warehouse (the "Warehouse").

k.    Inside the Warehouse, a law enforcement agent observed CUONG BANG exit Vehicle-2 carrying a black backpack (the "Black Backpack") and follow CS-1 and CS-2 into an office.

l.    At approximately 4:21 p.m., CUONG BANG handed the Black Backpack to CS-1 and CS-2.

m.    CS-1 and CS-2 then provided CUONG BANG with a bag containing approximately $20,000.

n.    CUONG BANG exited the office, reentered Vehicle-2, and drove away from the Warehouse.

o.    Law enforcement agents then took custody of the Black Backpack, and determined that it contained ten plastic bags, each of which contained a crystal-like substance resembling methamphetamine (the "Substance").

p.    The Substance field-tested positive for the presence of methamphetamine and weighed approximately 21.85 pounds, or roughly 9.9 kilograms.

### The March 18 Payment

11.    Based on my review of a telephone call between CS-2 and CUONG BANG, a/k/a "Cuong Anh Bang," a/k/a "John Bang," a/k/a "Jay Bang," the defendant, that CS-2 recorded at the DEA's direction, I have learned the following, in substance and in part:

a.    On or about March 14, 2019, CUONG BANG informed CS-2 by telephone, in substance and in part, that: CUONG BANG intended to travel to New York to deliver cartridges for marijuana vaporizer pens; CUONG BANG would also pick up the payment for the February 20 Transaction; and CS-2 and CUONG BANG could then discuss a future transaction and talk with "brother"[3] about any questions.    During this conversation, CS-2 stated that

---

[3] Based on my participation in this investigation, it appears that DANNY BANG, a/k/a "Chi Anh Bang," a/k/a "Danny Anh Bang," the defendant, is CUONG BANG's brother and that CUONG BANG was referring to DANNY BANG during this conversation.

he was located in Manhattan.

b.     CS-2 told CUONG BANG that CS-2 would not be in New York when CUONG BANG arrived, but that CS-2 would leave money for CUONG BANG with his cousin, who would provide the money to CUONG BANG.

c.     CS-2 and CUONG BANG further discussed that they would meet the following week in California to talk about future drug transactions.  CS-2 informed CUONG BANG that it would be another "45," by which CS-2 intended to convey that he wished to purchase another 45 kilograms of methamphetamine.

12.   Based on my conversations with other law enforcement agents, I have learned the following, in substance and in part:

a.     On or about March 18, 2019, an undercover DEA agent ("UC-2") communicated with CUONG BANG, via recorded telephone calls and text messages, in order to arrange a place and time for UC-2 and CUONG BANG to meet in order for UC-2 to provide payment to CUONG BANG.

b.     CUONG BANG informed UC-2 that he was in New Jersey.

c.     UC-2 suggested that UC-2 and CUONG BANG meet halfway between their locations, in downtown Manhattan.

d.     CUONG BANG suggested that he and UC-2 meet near a particular store in downtown Manhattan ("Store-1").

e.     At approximately 6:00 p.m., an individual whom law enforcement agents recognized, based on their comparison of his appearance with photographs in law enforcement databases, as CUONG BANG, met UC-2 near Store-1.

f.     UC-2 handed CUONG BANG $36,000.

WHEREFORE, I respectfully request that warrants be issued for the arrests of DANNY BANG, a/k/a "Chi Anh Bang," a/k/a "Danny Anh Bang," and CUONG BANG, a/k/a "Cuong Anh Bang," a/k/a "John Bang," a/k/a "Jay Bang," the defendants, and that they be imprisoned or bailed, as the case may be.

Douglas M. Waters
Special Agent
Drug Enforcement Administration

Sworn to before me this
19th day of March 2019

THE HONORABLE JAMES L. COTT
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK